**Patrick VAN BAKER, Appellant,**

v.

**STATE of Texas, Appellee.**

**No. 11–00–00246–CR.**

Court of Appeals of Texas,
Eastland.

Aug. 23, 2001.

Douglas Wilder, Dallas, for appellant.

Bill Hill, Criminal District Attorney–Appellate Section, Dallas, for appellee.

Panel consists of ARNOT, C.J., and WRIGHT and McCALL, JJ.

Opinion

ARNOT, Chief Justice.

After the trial court denied his motion to suppress, appellant entered a plea of nolo contendere to possession of cocaine. The trial court deferred the adjudication of appellant's guilt and placed him on community supervision for six years. We affirm.

In his sole point of error, appellant challenges the denial of his motion to suppress. In reviewing a trial court's ruling on a motion to suppress, appellate courts must give great deference to the trial court's findings of historical facts as long as the record supports the findings. *Guzman v. State*, 955 S.W.2d 85 (Tex.Cr. App.1997). We must afford the same amount of deference to the trial court's rulings on "mixed questions of law and fact," such as the issue of probable cause, if the resolution of those ultimate questions turns on an evaluation of credibility and demeanor. *Guzman v. State*, supra at 89. Appellate courts, however, review de novo "mixed questions of law and fact" not falling within the previous category. *Guzman v. State*, supra. When faced with a mixed question of law and fact, the critical question under *Guzman* is whether the ruling "turns" on an evaluation of credibility and demeanor. *Loserth v. State*, 963 S.W.2d 770, 773 (Tex.Cr.App.1998). A question "turns" on an evaluation of credibility and demeanor when the testimony of one or more witnesses, if believed, is always enough to add up to what is needed to decide the substantive issue. *Loserth v. State*, supra. We must view the record in the light most favorable to the trial court's ruling and sustain the trial court's ruling if it is reasonably correct on any theory of law applicable to the case. *Guzman v. State*, supra.

Three witnesses testified at the suppression hearing: Garland Police Officer D.M. Morrow, appellant, and Debbie Kingston, appellant's friend who was present at the apartment at the time of the search. Officer Morrow testified that he was assigned to observe the Bay Island Apartments due to drug activity. He was given names of people who might be involved in drug activity. Officer Morrow focused his attention on appellant, a maintenance man at the apartments. For about a month, Officer Morrow observed appellant's upstairs apartment from a field across the street. Using binoculars, Officer Morrow saw people going into appellant's apartment, staying a short period of time, and then leaving. Officer Morrow testified that the activity was consistent with drug sales. Officer Morrow also testified that, while he felt that he did not have enough evidence to obtain a search warrant, he felt that he had enough probable cause to knock on appellant's door and ask him about the drug activity and the complaints that he had received.

On March 2, 1998, Officer Morrow went to appellant's apartment and knocked on the door. Appellant opened the door. Officer Morrow testified that, through the open door, he observed Kingston sitting on the couch in front of a coffee table. Office Morrow also saw what appeared to be "three half-smoked joints of marihuana" in the ashtray on the coffee table. Officer Morrow also smelled a "slight odor of marihuana." He told appellant that he was investigating some drug complaints in the area and asked if he could come in and talk. Appellant agreed. Officer Morrow testified that appellant was "very cooperative." When Officer Morrow informed appellant that he saw what he "felt was possibly narcotics," appellant "stated that all he had left was just a little bit of smoke." Officer Morrow asked appellant if he "could show it" to him. Appellant reached under the coffee table and pulled out a purple metal container of paraphernalia and marihuana. Officer Morrow testified that he then read appellant his *Miranda* rights.[1]

Appellant told Officer Morrow that someone had left some marihuana in his apartment, that he was "holding it for him," and that it was not his. He went

---

1. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

into the kitchen and pulled a quarter baggie of marihuana out of a cupboard. Officer Morrow asked appellant if he could search the rest of the apartment. Officer Morrow testified that appellant responded: "[T]hat's all of it. I already gave it to you. I don't have nothing else." When his backup arrived, Officer Morrow told appellant to stand up and placed him under arrest. At that time, appellant resisted. Appellant was searched and a baggie containing 1.5 grams of cocaine was found in his pants.

Officer Morrow testified that appellant then "started stating that you can search." Appellant explained that a "friend left a lock box" in his apartment. Appellant consented to a search of his apartment, and the lock box was found in the bathroom. The box contained "scales with a heavy amount of off-white substance" on them and baggies.

Appellant testified that Officer Morrow knocked on his apartment door at around 9:00 p.m. and said that he wanted to ask appellant about the residents in Apartment 1066. Appellant answered that he could not help the officer because he had not had any dealings with those people. Appellant testified that this conversation took place in the threshold of his doorway and that the officer "more or less stepped past" appellant into the apartment. Appellant stated that he did not invite the officer into his apartment and that the coffee table was not visible from the doorway. Appellant did not recall the officer reading him his rights.

Appellant testified that he decided to show the officer the marihuana. Afterwards, the officer "persisted and persisted and persisted" requesting consent to search. Appellant stated that he explained that he had an "open door policy" with his friends, that he trusted his friends, that he did not feel comfortable giving permission to search because he

"wasn't aware if there [was] anything," and that he did not "want to get in trouble for it, for it not being [his] to begin with." Appellant further testified that, only "after what seemed an eternity but was only about an hour of consistently asking and asking and asking and [appellant] consistently telling him no," appellant signed the consent. Appellant admitted that there were some partially smoked marihuana cigarettes in the ashtray and stated that he consented to the search because "it finally got to the point to where this was going on way too long" and because he did not "want [his] son to be exposed or anything else to this any further." Appellant also stated that the marihuana cigarettes had been burned "a couple of hours" before Officer Morrow arrived. Appellant said that he did not resist and that he thought that he had been "complying pretty much all along."

Kingston testified that she heard Officer Morrow knock on the door. Appellant answered the door, and Officer Morrow walked past appellant into the apartment. Kingston testified that appellant did not invite the officer into the apartment. Kingston stated that she was sitting on the couch and that there was no marihuana on the coffee table. She also stated that there was no odor of marihuana in the apartment.

■ As the court in *Rodriguez v. State*, 653 S.W.2d 305, 307 (Tex.Cr.App.1983), noted:

Nothing in our Constitutions prevents a police officer from addressing questions to citizens on the street; it follows that nothing would prevent him from knocking politely on any closed door. Further, nothing in the statutes or governing constitutional provisions requires any citizen to respond to a knock on his door by opening it. Indeed, the very act of opening the door exhibits an inten-

tional relinquishment of any subjective expectation of privacy, particularly when illegal activity may be readily detected by smell and sight by anyone standing at the doorway.

Also, in *Bower v. State,* 769 S.W.2d 887, 897 (Tex.Cr.App.), *cert. den'd,* 492 U.S. 927, 109 S.Ct. 3266, 106 L.Ed.2d 611 (1989), the court observed:

Clearly, as noted above, anyone, be it law enforcement officer or common citizen, has the right to approach appellant's front door. As it was stated in *Davis v. U.S.,* 327 F.2d 301, 303 (9th Cir.1964):

"Absent express orders from the person in possession against any possible trespass, there is no rule of private or public conduct which makes it illegal per se, or a condemned invasion· of the person's right of privacy, for anyone openly and peaceably, ..., to walk up the steps and knock on the front door of any man's 'castle' with the honest intent of asking questions of the occupant thereof—whether the questioner be a pollster, a salesman, or an officer of the law."

Officer Morrow stated that he was aware that he did not, from his observation, have enough information to obtain a search warrant; and, consequently, he decided to go to appellant's residence to determine whether a crime was being committed. However, we have been instructed by *Horton v. California,* 496 U.S. 128, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990), that we should look at objective standards of the conduct rather than the subjective state of mind of the officer. *Walter v. State,* 28 S.W.3d 538 (Tex.Cr.App.2000).

Giving almost total deference to the fact findings of the trial court but reviewing de novo the legal determination of reasonable suspicion as we are required to do, we conclude that the trial court was correct in overruling the motion to suppress evi-

dence. Appellant's sole point of error is overruled.